UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

3 : CV - 04-0217

FILED
HARRISBURG
JAN 2 9 2004
MARY E. D'ANDREA, CLERK
Per ______
DEPUTY CLERK

ALOYSIOUS ALLIE CONTEH
(PETITIONER)

V.

BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT
(RESPONDENT)

CASE No: 29-850-629
CIVIL No:__________

## WRIT OF HABEAS CORPUS 28 U.S.C.A. § 2241 FOR THE RETURN OF VOLUNTARY DEPARTURE

Now comes Petitioner, **Aloysious Allie Conteh, (Pro-Se),** before this Honorable Court, with this Writ of Habeas Corpus 28 U.S.C.A. 2241, for the restoring of his **Voluntary Departure**, which was granted, and later terminated, by the Bureau of Immigration and Customs Enforcement (BICE), formerly Immigration and Naturalization Service (INS), Petitioner will show to this court all the facts of the violations of Petitioner's **"Equal Protection"** and **"Due Process"** afforded to him by the laws of the Constitution.

Petitioner believes the violations of his Constitutional Rights has brought about the injustice, to and his family himself, When he was taken into custody, and placed in the York County prison (YCP), in an intentional **"Indefinite Mandatory Detention".**

## LESS STRINGENT STANDARDS

Petitioner Aloysious Allie Conteh, is pro se, litigant, and is entitled to have his Habeas Corpus 28 U.S.C.A. § 2241, and asserted claims construed liberally, because pro-se litigants or held to less Stringent standards than Attorneys drafting such claims. See **Richardson v. U.S., 193 F. 3d 545, 548 (D.C. Cir. 1999) also Hanes v. Kerner., 30 L.Ed. 2d. 652, 654 (1972). ( "We hold less stringent standards than Attorneys drafting such claims").**

## FACTS OF THE CASE

Petitioner, Aloysious Allie Conteh, a 43 years of age, and a native and citizen of Sierra Leone, of West Africa, who entered the United States of America, through the John F Kennedy (JFK) international Airport, on December 7, 1988, under a visiting visa. Petitioner overstayed is visitors visa, and started a new life in the U.S.A. Petitioner and his wife Adeline in their union have two children, his daughter, kadiya Conteh 13 years of age, and his son Aloysious Karim Conteh 8 years of age.

## ARGUMENTS

1) Petitioner, now argues that the offices of BICE / INS, is deliberately misleading the courts, when they gave statements, that petitioner refused to leave voluntarily from the United States of America.

2) First and foremost, Petitioner will now show, the reasons why he did not leave the U.S. In 1996, when he received his voluntary departure, (1) there was an uprising of **civil war**, in Sierra Leone, and bordering country, of Guineas, of which those rebels, were been supported by Taylor, and the **Juanitas** against the **rebels** inside of sierra Leone, they were killings all over the place in the city even the fields.

3) During this time, Petitioner submitted an application for asylum to stay in the United States, due to the on going civil war, in Sierra Leone, which was escalating on a daily

basis, he was denied asylum in 1998, but was informed by the office of BICE / INS, that he could submit an application for **Temporary protection Status, (TPS),** Petitioner submitted his application for TPS which was immediately granted, Furthermore, he was also granted a permit to work in the United States, with an expiration date of **March, 2004.**

4) Petitioner, Therefore started his life with his wife, and was blessed with two children, Petitioner attended school, and acquired his Bachelors degree in Psychology, However, while in the United States, he helped **U.S. citizen children** to escape the **ignorance**, of the use, and **addiction** of **drugs** and **alcohol.**

5) Petitioner became a productive member of society, by working and paying taxes, supporting his family, and looking forward to his newly found life, of which he has freedom, and no fear, he believed that with the Temporary Stay, he could have continued as long he was abiding by the laws of the United States of America.

6) However, On November 13, 2003, without any notice, Petitioner was arrested and taken into custody for deportation proceedings, despite the TPS, which has an expiration date of March 2004, after he was taken into custody, he was informed by the offices of BICE / INS, that he declined to depart from the United States, in 1996, when infact the United States Immigration Service Acknowledges, the Danger in 1996, in Sierra Leone, and gave him a TPS, after they denied his application for Asylum. This action within the offices of BICE / INS, is infact "miscarriage of justice". After BICE / INS allowed him to work, and attend school, pay taxes, they decided, after 20 years that he could no longer stay in the United States. At the very least Petitioner should be granted his volunteer Departure again, and be allowed to return to his country, since he cannot stay here anymore.

## CONCLUSION

For all the right reasons, Petitioner believes he should be granted release, from the custody of BICE / INS, until the date of expiration of his TPS, which is valid until March 2004, and further states that the BICE / INS offices willfully and deliberately ignored the valid TPS, and remove him from his family, into Mandatory Indefinite Detention. This violation of petitioners Due Process Rights, should be terminated immediately, and petitioner released.

Petitioner prays that this Honorable Court, will see the injustice, that has been brought upon the Petitioner, and grant him this request.

December 25, 2003,

Respectfully Submitted

ALOYSIOUS ALLIE CONTEH

http://www.hrw.org/wr2k3/africa10.html

Human Rights Watch World Report 2003



# Sierra Leone


- Human Rights Developments
- Defending Human Rights
- The Role of the International Community


## HUMAN RIGHTS DEVELOPMENTS




Sierra Leone made significant progress in 2002. On January 18, President Ahmad Tejan Kabbah declared that the decade-long civil war had ended, and on March 1, he lifted the four-year state of emergency. On May 14 the people of Sierra Leone went to the polls and re-elected President Kabbah and his Sierra Leone People's Party for a further five-year term. The elections were largely peaceful, though there were a few reports of violence and intimidation. Eleven parties vied for the presidency and 124 parliamentary seats. The seventeen thousand-strong peacekeeping force of the United Nations Mission in Sierra Leone (UNAMSIL) completed disarmament of over forty-seven thousand combatants, contributing, with British-led efforts to rehabilitate the ill-disciplined police and army, to dramatic improvement in prospects for peace, security, and respect for human rights. By October more than 195,000 Sierra Leonean refugees from Guinea, Liberia, and the broader sub-region had returned home. Two important transitional justice mechanisms aimed at ensuring accountability for the horrific abuses that characterized the war--the Special Court for Sierra Leone and the Truth and Reconciliation Commission--also began operations. Against these positive developments, the intensification of civil war in neighboring Liberia created a large refugee population in Sierra Leone, resulted in instability in the border areas, and drew in hundreds of Sierra Leonean former combatants to fight for both Liberian government and rebel forces.

From May 2001 through January 2002, UNAMSIL disarmed and demobilized close to forty-eight thousand combatants from the rebel Revolutionary United Front (RUF) and Armed Forces Revolutionary Council (AFRC), and from the government-allied Civil Defense Force (CDF) militias. Of these, 6,845 had been child combatants, 92 percent of them boys. The vast majority of former child soldiers have been reunited with their families and about half of them were either enrolled in educational support or skills training programs. The United Nations Children's Fund (UNICEF) identified at least four hundred girls who remained with their former RUF captors, willingly or unwillingly. There were few reports of retaliation against former RUF combatants as they returned to their villages and towns. However, in former rebel strongholds returning refugees and internally displaced civilians sometimes faced problems from former rebels including intimidation and refusal to vacate returnees' homes that they had occupied.

In addition, a December 2001 dispute over mining in the diamond-rich Kono district led to serious clashes between former RUF rebels and youths from a local organization called the Movement of Concerned Kono Youths (MOCKY). During the clashes the youths, supported by policemen and former CDF militiamen, and allegedly backed by local chiefs and leaders, attacked former RUF combatants and their families. The clashes left at least thirteen mostly former RUF combatants dead, the majority of them hacked to death with machetes. During the fighting thousands of civilians, including hundreds of former RUF fighters, fled the area. There were periodic reports of MOCKY members using intimidation to evict non Konos from towns within Kono district in what appeared to be an attempt to consolidate ethnic Kono control over the diamond-mining area.

After being held without charge for eighteen months, former RUF leader Foday Sankoh and forty-nine other

former RUF rebels on March 4 were taken to court and charged with various criminal offenses including murder. The charges related to an incident on May 8, 2000 when Sankoh's bodyguards had opened fire on demonstrators in Freetown, the capital, killing at least twenty. Separately charged to court also in March were thirty-six members of the West Side Boys, a splinter group of the AFRC, who had been captured in September 2000, during a British assault on their base.

While there were very few complaints of abuses by the army, there were frequent complaints of corrupt, unprofessional, and in some cases violent practices by the Sierra Leone Police. Hundreds of ordinary criminal suspects continued to be arrested without warrants and/or unlawfully detained, many without due process guarantees as stipulated in the constitution. The insufficient number of judges, magistrates, prosecutors, and courtrooms continued to lead to huge backlogs within the legal system and the denial of justice for hundreds of detainees. The High Court was only functional in Freetown and two other provincial towns; several magistrates courts also remained closed, though three destroyed during the war, in Kambia, Makeni and Magburaka, were refurbished and reopened.

On July 5 President Kabbah formally swore in the seven Truth and Reconciliation Commission (TRC) commissioners, three international and four national. The commission had one year to prepare a record of abuses in Sierra Leone during the civil war from 1991 and make recommendations to avoid their repetition and promote healing. Efforts to establish the TRC were spearheaded by the Office of the United Nations (U.N.) High Commissioner for Human Rights (OHCHR), and was a priority for both the UNAMSIL human rights section and local human rights groups. In August the originally proposed budget of U.S.$9.98 million was scaled back to $6,276,440, of which, at this writing, barely a third had been pledged by donors. Following a three-month preparatory period, hearings were scheduled to begin in October 2002, but were pushed back until November following this poor donor response.

On January 16, after over a year of negotiations, the U.N. and the government of Sierra Leone signed an agreement that created the legal framework for the Special Court for Sierra Leone (SCSL), an independent court using both international and Sierra Leonean law, judges, and prosecutors. In March, the Sierra Leonean Parliament passed an act implementing this agreement into law. The court will be based in Freetown and will prosecute persons bearing "the greatest responsibility" for serious violations of international humanitarian law and certain crimes under national law perpetrated from November 30, 1996 onwards. On April 19, 2002, U.N. Secretary-General Kofi Annan appointed a senior attorney of the United States Department of Defense, David Crane, as the SCSL chief prosecutor, and Robin Vincent (United Kingdom) as registrar. After great delay by the U.N. Secretariat in obtaining the necessary approvals for funding the SCSL, it began operations in July. The SCSL is to operate for at least three years and has a proposed budget of U.S.$56.8 million. While funds for the court's first year have been secured, there are shortfalls for the second and third years. A management committee representing the major donor states (United States, United Kingdom, Netherlands, and Canada) plus Lesotho and Nigeria, has oversight over the functioning of the court. UNAMSIL offered little administrative and logistical support to the SCSL, despite official commitments to do so.

Among the impacts on Sierra Leone of the renewed war in Liberia, as of October 2002 the United Nations High Commissioner for Refugees (UNHCR) had registered more than 37,500 Liberian refugees in Sierra Leonean camps. Liberian government troops and rebels of the Liberians United for Reconciliation and Democracy (LURD) often crossed into Sierra Leone to loot, buy provisions, escape fighting, or abduct people who are then forced to work for them as porters. From January to October there were at least fifteen such cross-border incursions, resulting in at least two deaths and the abduction of scores of Sierra Leoneans.

Hundreds of former RUF, West Side Boys and CDF combatants in Sierra Leone crossed over to fight as mercenaries with either the Liberian government or the LURD. There were also credible reports of recruitment from within the Liberian refugee camps in Sierra Leone. The presence of hundreds of Liberian government and rebel deserters in Sierra Leone prompted the government of Sierra Leone to move to set up an internment camp, which at this writing was under construction.

Another vulnerability of refugees was highlighted in February 2002, in a report by UNHCR and Save the Children-U.K. which alleged that refugee children in Guinea, Liberia and Sierra Leone had been subjected to sexual abuse and exploitation by employees of national and international nongovernmental organizations (NGOs), UNHCR and other U.N. agencies. The report provoked a major outcry, including from Kofi Annan who said he was "clearly shocked and disturbed." The report found that the victims were mostly teenage girls, and that the perpetrators were often "men in positions of relative power and influence who either control access to goods and services or

who have wealth and/or income." The government of Sierra Leone, U.N. agencies and NGOs established a Coordination Committee for Sexual Exploitation and Abuse (CCSEA) to address the problem. The U.N. Office for Internal Oversight Services (OIOS) and the UNHCR inspector-general conducted an in-depth follow-up investigation, and in Geneva, the U.N. and humanitarian community formed the Inter-Agency Standing Committee (IASC) Task Force on Protection from Sexual Exploitation and Abuse to look at issues of protection and codes of conduct. However, the strategies adopted by the humanitarian agencies generally lacked a discussion of the importance of holding perpetrators accountable.

UNAMSIL was itself responsible for some similar and other abuses. In April witnesses saw a woman apparently being raped by two Ukrainian peacekeepers near the eastern town of Joru. There was no formal investigation into the matter. In June a Bangladeshi officer was accused of sexually assaulting a fourteen-year-old boy living in a transit camp for recently returned refugees. A formal UNAMSIL investigation came up with inconclusive results and the peacekeeper was repatriated soon after the investigation. On July 18 two people were killed and three injured after Nigerian UNAMSIL peacekeepers moved to quell violence that had erupted in Freetown after a Sierra Leonean black-market trader was allegedly murdered by Nigerian criminals. Initial reports by an ad-hoc UNAMSIL task force set up to investigate the incident found that the peacekeepers "employed a combination of persuasion, crowd dispersal tactics and firing of warning shots into the air" to break up the riot. They concluded that "the facts available to UNAMSIL indicate that at no time was firing directed at the crowd." By contrast, an August 22 report by a committee of seven Sierra Leonean human rights groups found that the peacekeepers fired into the crowd, killing the two, and characterized the peacekeepers' conduct as "disproportionate use of force." The leadership of UNAMSIL was generally reluctant to investigate allegations of abuses by peacekeepers.

## DEFENDING HUMAN RIGHTS

Numerous human rights NGOs operated in Sierra Leone. Thirty-three of these groups were part of a coalition called the National Forum for Human Rights (NFHR) whose purpose was coordination, and technical advice to the membership. The establishment of government control over previously inaccessible areas of the country allowed human rights groups to start operating outside Freetown. However, most of these lacked funding, expertise, and institutional support.

As in past years, these groups did little monitoring of human rights abuses. Most of their activities focused on human rights and civic education for the public, promoting reconciliation, and preparing for the TRC. Local groups did not generally document and publicly denounce governmental non-compliance with due process, and abuses by the police or army.

The formation of an autonomous, quasi-judicial national human rights commission, as provided for in the 1999 Lomé Peace Agreement, received little national or international attention and neither UNAMSIL nor the government actively advocated for its formation. Meanwhile, the existing governmental body, the National Commission for Democracy and Human Rights (NCDHR), formed in 1996, continued to be severely constrained by lack of funds. As in past years, it did little or no monitoring or documentation of human rights violations. Its activities consisted of voter education; human rights education for the army, police and members of Parliament; and preparation for the TRC. It did, however, continue to run a successful legal aid clinic for indigents.

## THE ROLE OF THE INTERNATIONAL COMMUNITY

International election observers, including the Carter Center, European Union, Commonwealth Observer Group, Organization of African Unity, and Economic Community of West African States, praised the manner in which the elections had been held, although they noted irregularities including multiple voting, underage voting, and direct interference with the marking of ballots. With the successful completion of disarmament and the peaceful elections, international donors turned their attention to post-conflict issues, including the reintegration of former combatants, resettlement of refugees and the internally displaced, consolidation of state authority, and the fight against corruption. While there was donor support for the Special Court for Sierra Leone, at least for its first year of operations, there was inadequate support for other accountability mechanisms including the Truth and Reconciliation Commission (to which, at this writing only U.S.$2.1 million--$500,000 each from the United Kingdom, the United States, and the Netherlands, $400,000 from Norway, and $200,000 from Sweden--had been pledged towards the more than $6.2 million budget) and rehabilitation of the judicial system.

## United Nations

The presence of 17,500 peacekeepers, currently the largest and most expensive U.N. military mission in the world, contributed significantly to the successful completion of both disarmament and elections. UNAMSIL's budget for 2002 was an estimated U.S.$717 million. In a June 19 report to the U.N. Security Council on UNAMSIL, Kofi Annan said that existing governmental security apparatus was not yet capable of protecting Sierra Leone from both internal and external threats and warned that the international community must protect the major investments that had made possible the progress achieved so far. On September 24, the Security Council extended UNAMSIL's mandate for a further six months, following a further report on UNAMSIL which laid out benchmarks to govern the withdrawal of the U.N. from Sierra Leone, including the ability of the police and army to maintain security, the successful re-integration of ex-combatants, and the situation in the broader sub-region. The resolution also encouraged UNAMSIL to promote zero tolerance of sexual violence and exploitation and called on states to bring to justice their own nationals responsible for such crimes in Sierra Leone.

The UNAMSIL human rights unit--mandated in 2001 to be twenty persons strong--usually operated with at least seventeen monitors and operated four regional human rights offices, in Kenema, Port Loko, Makeni, and Koidu. The monitors conducted investigations into ongoing and past abuses, including an in depth project on victims of amputation and sexual violence, and set up a database to map human rights abuses during the conflict. UNAMSIL supported a research project on war-related sexual violence by Physicians for Human Rights, and in February jointly launched the project's comprehensive report. In June 2002, OHCHR funded a month-long mission to Sierra Leone by a team of Argentinian forensic experts who conducted preliminary investigations into numerous mass grave sites and alleged "execution houses."

In December 2001, the Security Council extended for an additional eleven months the ban on imports of rough diamonds from Sierra Leone that did not have a government certificate.

The Mine Ban Treaty entered into force for Sierra Leone on October 1. Sierra Leone had not submitted its initial Article 7 Report, which was due on March 20.

## Organization of African Unity/African Union and Economic Community of West African States

Diplomatic activity by the OAU/African Union and Economic Community of West African States (ECOWAS) focused on resolving the crisis in Liberia, including by addressing its regional aspects. However, there was reluctance to address the presence of LURD rebels in Sierra Leone.

## European Union

The E.U. Special Envoy for the Mano River region (i.e. Guinea, Liberia, and Sierra Leone), Hans Dahlgren, had by October 2002 visited the region five times following his appointment in 2001.

Ongoing European Commission development cooperation projects in Sierra Leone totaled €142 million (approximately U.S.$139 million), and were primarily focused on social sector development. In late 2001, the European Commission gave €10 million ($9.85 million) to the Disarmament, Demobilization, and Reintegration (DDR) Multi-Donor Trust Fund to assist former combatants. In January 2002, the European Commission granted €17 million ($16.75 million) for humanitarian assistance to refugees and internally displaced persons affected by crisis within the Mano River Union. Out of this, €11 million ($10.8 million) was granted to projects in Sierra Leone.

The European Initiative for Democracy and Human Rights chose Sierra Leone as one of its "focus countries," and made available €2 million per year over three years (2002-04) to be allocated to NGOs working on human rights and good governance.

At this writing, the E.U. itself had not decided on any joint E.U. contribution to the Sierra Leone Special Court,

**Back**

© Amnesty International

sierra_leone.pdf

though a number of member states contributed, including Denmark, Germany, the Netherlands, Sweden, and the United Kingdom.

## United Kingdom

The U.K. continued to play a pivotal role in political and military developments in Sierra Leone. Priorities were the rehabilitation of the army and police, the fight against corruption, and the provision of humanitarian relief. During a visit to Sierra Leone in February, Prime Minister Tony Blair gave reassurance of the U.K.'s long-term commitment to Sierra Leone. However, Secretary of State for International Development Clair Short, visiting in February, warned that governmental failure to address "endemic" corruption could jeopardize the U.K.'s willingness to invest in and assist the country.

The U.K. continued its efforts to rebuild, restructure and equip the Sierra Leone Army and the Sierra Leone Police. In May, the British-led International Military Advisory and Training Team (IMATT) completed the training of over fourteen thousand Sierra Leonean soldiers, some three thousand of whom were former rebels or government militia members. In July, 220 British combat support troops left Sierra Leone, albeit 114 mostly U.K. military personnel continued to play a major role in advising and directing military operations, including the staffing of key positions within the Sierra Leone defense headquarters. In coordination with the Commonwealth Secretariat, the U.K. also provided officers and funds for training and administration of the Sierra Leone Police, including the secondment of a British officer as inspector general.

During 2002, U.K. assistance to Sierra Leone, mostly administered through the Department for International Development (DFID), was estimated to be €38.3 million (U.S.$59 million). This included funding for the Anti-Corruption Commission, rehabilitation of the legal system, reintegration programs for combatants, training of the army and police, assistance to the National Electoral Commission and to human rights and civil society groups, humanitarian aid, and helping to restore the local Paramount Chiefs. The U.K. pledged €5.9 million ($9.1 million) over three years to the Special Court, €322,000 ($500,000) to the TRC, and spent an estimated €16 million ($24 million) on IMATT.

## United States

U.S. policy on Sierra Leone revolved around supporting the consolidation of civil authority, fighting corruption, combating the spread of HIV/AIDS, and providing humanitarian support. The U.S. pledge of $15 million over three years to the SCSL was the largest of any contributing nation. The U.S. total humanitarian and emergency contribution in fiscal year 2002, including grants to aid agencies, World Food Programme, assistance to refugees, programs to combat HIV/AIDS, reintegration of combatants, and development programs was $56 million. In March, the U.S. contributed $1.9 million to the DDR program. In September, the U.S. dispatched an additional $6.6 million from the Emergency Refugee and Migration Fund (ERMA) to respond to the refugee crisis brought on by the renewed war in Liberia. The U.S. provided three military officers to work with the IMATT.

Of the seven West African battalions trained by the U.S. for peacekeeping with UNAMSIL, five--four Nigerian and one Ghanaian--were in 2001-02 deployed to Sierra Leone. There was no mechanism set up to monitor the behavior and performance of the soldiers.

Back to Top

Table of Contents > Africa

**Back**

# Amnesty International

# Sierra Leone

Covering events from January - December 2002



**REPUBLIC OF SIERRA LEONE**
**Head of state and government:** Ahmad Tejan Kabbah
**Death penalty:** retentionist
**International Criminal Court:** ratified

**There was a significant improvement in the human rights situation as a decade of internal armed conflict was officially declared ended in January. Progress was made towards addressing impunity for past human rights abuses committed by both government and armed opposition forces during the conflict. Developing national capacity, including strengthening the justice system, to promote and protect human rights remained a priority. The former leader of the armed opposition, together with some 100 others, was brought to trial on charges of murder and other offences but hearings were repeatedly postponed and international standards of fair trial were not met. Some 20 others associated with the former armed opposition were held without charge or trial. While large numbers of Sierra Leonean refugees and internally displaced people returned home, conflict in neighbouring Liberia resulted in an influx of Liberian refugees.**

---

### Background

The internal armed conflict which began in 1991 was officially declared over in January 2002 with completed demobilization and disarmament of more than 55,000 combatants, including almost 7,000 children, from the armed opposition – the Revolutionary United Front (RUF), the Armed Forces Revolutionary Council (AFRC) and renegade soldiers of the Sierra Leone Army – and the government-allied Civil Defence Forces. Inadequate funds, however, hampered their reintegration into society. The national army and police – restructured, trained and equipped by the international community – gradually resumed responsibility for security and law enforcement in areas previously affected by conflict. Support from the UN Mission in Sierra Leone (UNAMSIL), however, remained necessary, in particular in border areas. Security also remained a concern in diamond-producing areas.

**Further information**

Guinea, Liberia and Sierra Leone: Diamond trading must be controlled and monitored from the point of mining to the point of export
(AI Index: AFR 05/001/2002)

---

All AI documents on Sierra Leone

Presidential and parliamentary elections in May were generally judged free and fair. President Ahmad Tejan Kabbah obtained 70 per cent of votes and was re-elected for a further five-year term. His party, the Sierra Leone People's Party, also gained a large majority in parliament. Many members of the security forces, however, voted for Johnny Paul Kamara, former leader of the AFRC which came to power following a military coup in 1997. The RUF, which had transformed into a political party, contested the elections but fared poorly.

Continuing armed conflict in neighbouring Liberia threatened to undermine Sierra Leone's newly found peace. Former combatants were reported to have been recruited by Liberian government and armed opposition forces. Armed groups from Liberia attacked villages near the border and in some cases abducted civilians. The heads of state of Guinea, Liberia and Sierra Leone, the Mano River Union countries, met in Morocco in February in order to address sources of instability and build confidence. Efforts were also made by the Economic Community of West African States (ECOWAS) to restore peace and stability in the region.

### Impunity

There was progress in addressing impunity for gross human rights abuses committed during the conflict, notably in the establishment of the Special Court for Sierra Leone, which the UN Security Council decided in 2000 to set up to try those most responsible for crimes against humanity, war crimes and other serious violations of

international humanitarian law, and the Truth and Reconciliation Commission (TRC), which was provided for by the 1999 Lomé peace agreement. The Special Court will, however, only look at crimes committed after 30 November 1996. Efforts were made to clarify the relationship between the Special Court and the TRC to ensure effective cooperation. Investigations into past abuses began, including examination of mass graves and gathering testimonies from victims.

The UN and the government signed an agreement in January on the establishment of the Special Court and implementing legislation was passed in March. A Registrar, Prosecutor and Deputy Prosecutor were appointed in May, and in December eight judges – both international and Sierra Leonean – for trial and appeals chambers were sworn in. The Special Court was expected to begin hearings in mid-2003. No names of those to be indicted by the court had been made public by the end of the year. In a meeting with the Prosecutor in July, AI stressed the importance of full independence to prosecute those most responsible for crimes within the Court's jurisdiction, regardless of political affiliation during or since the conflict.

Commissioners for the TRC – again both international and Sierra Leonean – were appointed in May. Although inaugurated in July, progress was hindered by inadequate funds from the international community. The TRC was expected to operate for 15 months with a possible extension of a further six months.

The general amnesty for all acts undertaken in pursuit of the conflict, which was provided by the Lomé peace agreement and subsequently passed into law, remained a serious impediment to addressing impunity comprehensively, although it was not a bar to prosecution by the Special Court.

**Trial of Foday Sankoh and others**

In March, emergency regulations allowing indefinite detention without charge or trial, under which over 120 members of the RUF and other armed opposition forces had been detained, were lifted. RUF leader Foday Sankoh and some 50 others were subsequently charged with conspiracy to murder, murder and shooting with intent to kill in connection with an incident in May 2000 when about 20 people were killed and dozens injured after RUF members fired on civilians protesting outside Foday Sankoh's Freetown residence. The Attorney General and Minister of Justice said that these charges would not prejudice any case which the Special Court might subsequently bring. At least another 13 RUF members were subsequently charged with similar offences. Thirty-eight members of the "West Side Boys", a group of renegade soldiers, were also charged with conspiracy to murder, murder and aggravated robbery. If convicted, the defendants could face the death penalty.

The trial before the High Court was repeatedly postponed, in some cases because of Foday Sankoh's ill health, and there was little progress by the end of the year. Defendants had no access to lawyers at any stage of the legal proceedings, in violation of international fair trial standards. The fact that the defendants were charged with capital offences exacerbated concerns about lack of legal representation. They were also denied visits from their families.

Disquiet was expressed by the UN High Commissioner for Human Rights, AI and others that, while the maximum sentence which can be imposed by the Special Court is life imprisonment, the national courts may impose the death penalty.

Concerns remained about poor conditions, including inadequate medical care, for prisoners in the Central Prison, Pademba Road, in Freetown and other places of detention. In August one of the defendants died; his death was officially described as resulting from "psychosis". Although referred to the police for investigation, no clarification of the exact circumstances of the death emerged.

**Detention without charge or trial**

Despite the lifting of emergency regulations, some 20 detainees, all believed to be military personnel, remained held without charge or trial in the Central Prison, Pademba Road, at the end of the year. There was no legal basis for their continued detention.

**Strengthening national institutions**

Opportunities arose to address serious deficiencies in the justice system which had been aggravated by the conflict. While the Special Court focused on past human rights abuses and would only try a limited number of cases, AI considered it crucial that it contributed to the long-term strengthening of the national justice system, including personnel, training and infrastructure. A joint World Bank and United Kingdom (UK) Department for International Development team visited Sierra Leone in June and July to undertake a preliminary review of the justice sector.

Although some magistrates' courts were reopened outside the capital, Freetown, only five of 14 in the country were functioning, and these with limited capacity. Lack of trained legal personnel and the absence of legal aid caused a large backlog of cases and prolonged pre-trial detention. The UN Office of the High Commissioner for Human Rights assisted a local group to provide legal aid.

No progress was made in the establishment of a National Human Rights Commission, provided for by the Lomé peace agreement. The Special Adviser to the UN High Commissioner for Human Rights on national institutions wrote to the Vice-President, formerly Attorney General and Minister of Justice, to propose possible options for its speedy establishment.

**Refugees and internally displaced people**

Over 100,000 Sierra Leonean refugees returned home, mostly from Guinea and Liberia. Many were assisted by the UN High Commissioner for Refugees (UNHCR); others returned on their own. Some 124,000 internally displaced people were also resettled during the year. As conflict in Liberia escalated, however, there was a large influx of Liberian refugees; an additional 37,000 had arrived by November. Efforts by UNHCR to facilitate repatriation of Sierra Leonean refugees and protect the large number of Liberian refugees were, however, hampered by lack of funds.

In February a report by UNHCR and Save the Children-UK revealed the risks of sexual abuse and exploitation faced by refugee and internally displaced children in Guinea, Liberia and Sierra Leone from employees of national and international non-governmental organizations, UNHCR and other UN bodies, security forces and other refugees and internally displaced people. Although the UN Office of Internal Oversight Services carried out an investigation into these allegations and published a report in October, AI was concerned that its terms of reference were too limited and therefore unlikely to yield findings which reflected the true situation.

**UN Mission in Sierra Leone (UNAMSIL)**

In September the UN Security Council agreed to a reduction in the military component of UNAMSIL, with withdrawal to be largely completed by December 2004, provided that there was sufficient investment in developing the capacity of the army and police and taking into account the conflict in Liberia. The UNAMSIL military force of 17,500 had been reduced by 600 by the end of 2002.

The human rights component of the UNAMSIL human rights section continued to monitor the human rights situation and provide technical cooperation. It provided support to the Special Court and TRC and human rights training for UNAMSIL personnel, including peace-keeping troops, as well as Sierra Leonean police and army personnel. Two regional offices were opened early in the year, in Port Loko and Koidu, adding to those in Kenema and Makeni, thereby increasing capacity to monitor the human rights situation throughout the country.

**Allegations of violations by UNAMSIL peace-keeping troops**
In January, the UN Children's Fund (UNICEF) and CARITAS-Makeni, a Catholic non-governmental organization, reported several cases of sexual misconduct against children by UNAMSIL peace-keeping forces. These allegations were investigated by UNAMSIL together with child protection agencies and preventive measures were put in place to protect children and women.

In July, two people died from bullet wounds and another three were injured after UNAMSIL peace-keeping forces fired shots to quell rioting in Freetown which broke out after the killing of a local trader. An investigation by UNAMSIL concluded that firing had not been directed at the crowd and that there was no conclusive evidence as to how individuals were killed or injured.

**Military assistance and the diamond trade**

Although the conflict was officially ended, measures continued to prevent trade in diamonds being used to finance military assistance to armed groups. The UN Security Council extended a ban on direct and indirect imports of rough diamonds from Sierra Leone, exempting those exported under the government's Certificate of Origin scheme. Controls were still needed, however, to track diamonds from the point of mining, and extension of government authority to diamond-producing areas remained crucial.

The Security Council also maintained a ban on arms transfers and rough diamond exports from Liberia, which had supported the RUF. Progress was made by governments and the international diamond industry towards the establishment of an international certification scheme. The scheme was launched in November and was expected to come into effect in January 2003.

**AI country visits**

AI delegates visited Sierra Leone in April and May to carry out research on the national justice system. They met senior government officials and members of UNAMSIL.

U.S. DEPARTMENT *of* STATE

## Sierra Leone

Country Reports on Human Rights Practices - 2002
Released by the Bureau of Democracy, Human Rights, and Labor
March 31, 2003

Sierra Leone is a constitutional republic with a directly elected President and a unicameral legislature. On January 18, the devastating 11-year civil conflict officially ended when all parties to the conflict issued a Declaration of the End of the War. The Government since asserted control over the whole country, backed by a large U.N. peacekeeping force. Revolutionary United Front (RUF) insurgents, who fought successive governments since 1991, completed disarmament and demobilization. The Civil Defense Force (CDF), a government-allied militia, also disarmed and demobilized, but many CDF members retained informal links to act in concert as a veterans' lobbying group and in their centuries-old role as members of traditional hunting societies. In May peaceful presidential and parliamentary elections were held; Ahmed Tejan Kabbah was re-elected President and his Sierra Leone People's Party (SLPP) won a large majority in Parliament. Many international monitors declared the elections free and fair; however, there were numerous reports of election irregularities and abuses. Since the resumption of the disarmament, demobilization, and reintegration (DDR) process in May 2001, an estimated 72,500 former combatants disarmed; on January 31, the disarmament and demobilization sections of the program were completed. The process of reintegration continued at year's end. The U.N. maintained a force of approximately 17,500 peacekeepers during most of the year. In September the U.N. Security Council decided to begin a gradual withdrawal of U.N. Mission to Sierra Leone (UNAMSIL) troops, to be completed by 2005. The official independent judiciary began functioning in areas abandoned during the war, but there still were sections of the country where the judiciary had not yet returned. The judiciary demonstrated substantial independence in practice but at times was subject to corruption.

Among the Government's security forces, the police officially had primary responsibility for internal order; however, on occasion, the Republic of Sierra Leone Armed Forces (RSLAF) and UNAMSIL shared responsibility with the police in security matters. The RSLAF were deployed to all vital locations and secured the country's borders with guidance and leadership from the British-led International Military Advisory and Training Team (IMATT). The Sierra Leone Police (SLP) were present in all provincial and district capitals. The Government maintained control of security forces throughout the year. During the year, more than 55,000 ex-combatants were registered with the National Commission for Disarmament, Demobilization, and Reintegration (NCDDR). Approximately 31,000 of these ex-combatants were engaged in reintegration program activities, ranging from formal education and vocational skills training to small-scale trade, agriculture, and community development. NCDDR projected that 7,000 more ex-combatants would enter reintegrations programs every 6 months, until all registered combatants had entered the programs. Some members of the security forces committed human rights abuses.

The country had a market-based economy and remained extremely poor; per capita earnings for the population of under 5 million have declined approximately by two-thirds since 1970. The country was rich in natural resources and minerals (particularly diamonds, gold, rutile, and bauxite) and had large areas of fertile land suitable for farming. Mineral extraction and agricultural production began after a virtual standstill during the war; however, the illegal diamond industry continued to operate. There was little manufacturing, and there were few exports; approximately 60 percent of the Government's budget came from foreign assistance. Years of fighting and decades of corruption and mismanagement resulted in a devastated infrastructure.

The Government generally respected the rights of its citizens; however, there were serious problems in several areas. With the end of war and demobilization of the RUF and CDF, many systematic and serious human rights abuses ended. During the year, there were no reports of unlawful killings or other abuses by the CDF in support of the Government. RSLAF soldiers at times beat former RUF rebels. Prison conditions improved significantly during the year. The number of deaths in custody declined considerably. On March 1, civil liberties suspended under the Constitution were reinstated when the Government lifted the state of emergency. Members of the SLP continued to arrest and detain persons arbitrarily. There were reports of extortion by police. Prolonged pretrial detention, due to a severe lack of resources in the judicial system, remained a problem. The Government at times limited freedom of speech and the press during the year. Violence in Liberia, which produced an influx of more than 50,000 Liberian refugees, contributed to border areas becoming more unstable. Violence, discrimination against women, and prostitution remained problems. Female genital mutilation (FGM) remained widespread. Abuse of children was a problem; however, numerous children who fought as child soldiers continued to be released and participated in reintegration programs during the year. Residents of non-African descent faced institutionalized political restrictions. Forced labor continued to be a problem in rural areas. Child labor remained a problem. There were reports of trafficking in persons. Sierra Leone was invited by the Community of Democracies' (CD) Convening Group to attend the November 2002 second CD Ministerial Meeting in Seoul, Republic of Korea, as an observer.

There were some reports of abuses committed by former RUF rebels. International aid groups believed that many girls who were abducted by the RUF remained sex slaves during the year. Some young ex-combatants still were dependent on their former RUF commanders for support.

There was no cross-border conflict between rebel forces and the Guinean military. During the year, there were incursions into the country by Liberian combatants. At times the combatants looted villages and abducted inhabitants, reportedly to use them as porters.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of the arbitrary or unlawful deprivation of life committed by the Government or its agents.

Unlike in the previous year, there were no reports that forces operating in support of the Government committed unlawful killings.

No action was taken against the CDF members responsible for the June 2001 killing of three civilians during an attack in Kono district or the June and July 2001 retaliatory attack by the RUF that resulted in three deaths.

No action was taken against the members of the security forces responsible for the following incidents in 2000: The May and June killings of 27 persons in the towns of Makeni, Magburaka, and Kambia; the July killing of civilians in Bunumbu during a helicopter gunship attack; and the July execution of an RUF fighter who allegedly was trying to surrender.

Two persons were killed during a demonstration, and alleged eyewitnesses claimed UNAMSIL troops were responsible for the killings (see Section 2.b.).

There were a number of deaths in custody during the year (see Section 1.c.). In September one RUF member who was indicted for murder died in custody.

No action was taken against the members of the Economic Organization of West African States (ECOWAS) Monitoring Group (ECOMOG) responsible for the January 2000 stabbing death of a

civilian in a market and the April 2000 killing of an ex-Sierra Leone Army (SLA) soldier.

Unlike in the previous year, there were no reports that RUF members were responsible for killings during the year or killed ex-combatants who had fled the group. There also were no reports of mutilations that led to deaths by rebel groups.

In March RUF leader Foday Sankoh and 49 RUF co-defendants were indicted with 16 counts of murder and 54 counts of shooting with intent to commit murder in connection with the 2000 incident outside Sankoh's residence in Freetown in which 20 persons were killed and 80 persons were injured. Thirty-one members of an ex-SLA splinter group called the West Side Boys were charged with 11 counts of murder and 11 counts of robbery with aggravation in connection with incidents that took place in Port Loko District in 1999 and 2000. Sankoh, the 49 former RUF rebels, and the indicted West Side Boys remained in detention awaiting trial at Pademba Road Prison at year's end.

No action was taken against the RUF for the following incidents in 2001: The July killing of 22 persons in an attack on the village of Henekuma; the August killing of 2 persons in an attack on the village of Seria, in Koinadugu district; and the death of four former RUF members, allegedly under orders from RUF chairman Issa Sesay.

No action was taken against the RUF rebels responsible for the following killings in 2000: The April and May killings of U.N. peacekeepers; the May killings of journalists Kurt Schork and Miguel Gil Moreno; the June killings in the attack on Port Loko; and the August killing of nine civilians in the village of Folloh. Although the Special Court for Sierra Leone was expected to examine these incidents, no further action was taken by year's end.

An international forensic investigation team visited alleged mass gravesites throughout the country, including several sites in the Port Loko district. Local residents claimed that the victims were civilians executed by ex-Armed Forces Revolutionary Council (AFRC)/RUF members in 1999. Human Rights Officers from UNAMSIL and representatives from the Special Court for Sierra Leone also visited several suspected mass gravesites. In February a former RUF member reported that he had witnessed 75 CDF members killed in an "execution house" in Kailahun in 1998.

Unlike in the previous year, the Guinean army did not attack any part of the country. The Guinean army continued to occupy disputed territory in Yenga, Kailahun District. There was no further verification of reports that Guinean soldiers bombed and shelled villages in the Kambia District in 2001, killing or injuring many civilians, and no action was taken against Guinean soldiers who allegedly carried out these attacks. One Guinean commanding officer was relieved from command after leading an attack against a just-demobilized column of RUF soldiers at a disarmament site at Rokupr, Kambia District in May 2001.

There was no action taken against Guinean armed forces that reportedly participated in the following killings in 2001: The January helicopter gunship attack on the town of Kamakwie that reportedly killed 12 civilians; the February incident of Guinean artillery fire that allegedly killed 4 civilians in Sabuya; the February killing of a 3-year-old girl in the village of Rokel; and the May killing of a small child in Rokupr.

b. Disappearance

With the demobilization and disarmament of the RUF, there were no reports that RUF rebels abducted children, women, or men as slaves or soldiers; however, some women and children remained in captivity during the year. The RUF did not exert significant control over the civilian population in any area of the country. The U.N. estimated that rebel forces abducted approximately 20,000 persons throughout the country during the 1991-1999 period. More than 10,000 victims were released and went through a formal reintegration process; most of those released were children. Many others escaped; however, former RUF rebels continued to hold some persons, including women and children as laborers or sex slaves at year's end. Some human rights monitors said that some of the women remained with their captors during the year due to a lack of viable options and intimidation by their captors (see Section 5). According to child protection officers from

nongovernmental organizations (NGOs), the Government was hindered severely by a lack of resources and has taken little action to secure their release. The Ministry of Social Welfare, Children, and Gender maintained a database, with the help from UNICEF, which attempted to track children separated from their families during the war.

There were no developments in the following disappearances in 2000: The February abduction of 11 passengers by the RUF from a bus near Masiaka; the July disappearance of a foreign worker following an attack by the West Side Boys; the July abduction of 18 persons by the West Side Boys during an attack on a bus; and the August kidnaping of 15 persons by the RUF during an attack on the village of Folloh.

During the year, Liberian combatants abducted persons in the country. For example, on July 16, armed Liberian combatants abducted 28 persons from the villages of Mandavalahun, Sange, and Kolu in Kailahun District. The combatants captured 31 villagers in the raid, but 3 escaped. On July 25, an armed group from Liberia abducted 18 persons during a raid of the village of Kokobu, Kailahun District. The Liberian combatants were thought to be using the villagers primarily as porters for looted goods. RSLAF performed frequent border patrols to deter such attacks, and UNAMSIL maintained a heavy presence in Kailahun District; however, the border with Liberia was very porous, and cross-border raids were difficult to stop completely.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits such practices; however, there was one unconfirmed report of soldiers beating a person. There also were reports that police accepted bribes and extorted money from motorists. Unlike in the previous year, there were no reports that the CDF beat or otherwise abused persons on behalf of the Government. The conduct of the RSLAF continued to improve following reorganization and increased training.

On February 12, two uniformed RSLAF soldiers allegedly beat two former RUF combatants in the presence of two police officers. The police officers allegedly did not intervene and accepted bribes from the soldiers. RSLAF officials said that the two soldiers were former SLA members and no longer were in military service. An SLP official in the Criminal Investigations Division said that the men were RSLAF members and made a formal request to the RSLAF to identify the perpetrators.

During the year, there were frequent reports that SLP officers took bribes at checkpoints, stopped and falsely charged motorists with violations, and impounded vehicles in order to extort money. Unlike in the previous year, there were no reports that drivers were beaten if they refused to pay.

Unlike in the previous year, there were no reports that the military or the CDF manned roadblocks and bridges to extort money. There was no further information on the disciplinary action taken against an SLA soldier who in 2001 reportedly beat a driver who refused to pay at a roadblock on the road from Kabala to the Guinean border.

There was no action taken against the CDF members responsible for beating, raping, or otherwise abusing the persons in the following cases from 2000: The May and June injuring of 50 persons during gunship attacks on the towns of Makeni, Magburaka, and Kambia; the July raping of 3 women who were accused of transporting goods to rebel-held areas; the August beating of 2 truck drivers because they could not produce the requested bribe; and the October beating of a journalist.

There was no action taken against the relatives of the Minister of Transport and Communication who allegedly beat a journalist, Mustapha Bai Attila, in 2000.

No one was injured by landmines during the year; very few landmines were used in the 11-year conflict.

A policeman allegedly raped a minor girl at the Jembe refugee camp. SLP personnel were removed from the camp during the investigation; however, the alleged perpetrator died and the case was closed.

During the year, there were reports that UNAMSIL soldiers raped persons. For example, on June 26, a UNAMSIL soldier allegedly raped a 14-year-old boy in Jui, Western Area. Although there was strong circumstantial and physical evidence that the rape occurred, 10 days after the alleged rape a UNAMSIL investigation did not find convincing physical evidence to validate the boy's allegation. The UNAMSIL soldier later was sent home, and UNAMSIL sent details of the allegations and findings to the soldier's government.

In April two UNAMSIL soldiers allegedly raped a woman in Joru, Kenema District. International human rights monitors talked to eyewitnesses who supported the victim's claim. UNAMSIL representatives said they carried out an investigation, although international human rights monitors claimed that the investigation was insufficient. UNAMSIL instituted a Personnel Conduct Committee to receive complaints on conduct impropriety. The UNAMSIL Human Rights Section held training sessions for peacekeepers on sexual abuse.

No action was taken against the ECOMOG employee who injured a person during an argument over a stolen vehicle in 2000.

Unlike in the previous year, there were no beatings, rapes, or abductions of women or refugees committed by organized groups of former combatants; however, it was likely that such crimes were committed by individual ex-combatants including former RUF rebels. In previous years, the RUF committed numerous abuses, including abductions, torture, beatings, and rapes, including gang rapes. There also were no reports of deliberate mutilations during the year. UNAMSIL began systematic investigations of amputees, tracking and monitoring individual amputation cases and compiling statistics. U.N. officials and humanitarian organizations estimated that hundreds if not thousands of persons, including children, had one or both limbs amputated over the decade-long conflict. There were no more reports of RUF rebels carving the initials "RUF" into the skin of civilians. During the year, a U.S.-based plastic surgeon removed the "RUF" scars from many victims.

In September Foday Sankoh and 49 other RUF members appeared in High Court. The trial was postponed throughout the year, and the cases of Sankoh and his co-defendants had not been heard (see Section 1.a.).

No action was taken against RUF rebels who committed human rights abuses in 2001, including extortion, beatings, and rapes. No action was taken against RUF members who in April 2001 beat and killed a woman and beat her stepson in Seidu, Kono District.

There was no reported action taken against the RUF rebels who beat, raped, or otherwise abused the persons in the following cases from 2000: The February beating of 15 RUF combatants who tried to join the disarmament process; the March abduction and injuring of Aaron Kargbo and Aruna Sherrif, both Adventist Development and Relief Agency staff members; the April and May abduction of U.N. peacekeepers; and the May injuring of at least 1 civilian during a confrontation between British paratroopers and RUF rebels at Lungi Lo.

There were no developments on the unconfirmed reports that Guinean troops operating in the country amputated the limbs of suspected RUF members in 2001.

Prison conditions improved significantly during the year. International human rights monitors who visited Pademba Road maximum-security prison reported that conditions there were good, with adequate access to food, medical care, recreation, and vocational skills training. In July human rights monitors reported that prisons in Bo and Moyamba were generally good; however, a prison in Kenema suffered from overcrowding, and access to medical facilities was limited. In October a rebuilt detention facility opened in Kono District. Many of the problems that remained in prisons were a result of the poor state of the judicial system. A large backlog of cases led to problems with overcrowding. The Pademba Road prison, which was designed for 325 prisoners, routinely housed hundreds more. There were no reports that prisoners were held incommunicado, although it was government policy to forbid family visits to prisoners at Pademba Prison except in exceptional circumstances and on a case-by-case basis. According to international monitors, the mortality rate in Pademba Prison was within acceptable actuarial norms. Male and female prisoners were housed

separately. Adults and juveniles were incarcerated together. Conditions in the holding cells in police offices were extremely poor. Pretrial detainees were held with convicted prisoners. There were no reports that prison guards tortured or beat former RUF members in prison. There was no further investigation into the March 2001 killings at Pademba Prison.

International monitors, including UNAMSIL and the International Committee for the Red Cross (ICRC), had unrestricted access to visit Pademba Prison and other detention facilities. The ICRC and UNAMSIL doctors visited and monitored the health of former RUF leader Foday Sankoh, who was said to be in poor health. At least one local human rights group claimed that it could not get unrestricted access to the prisons.

d. Arbitrary Arrest, Detention, or Exile

The Constitution prohibits arbitrary arrest and detention; however, government forces occasionally arrested and detained persons arbitrarily. The law requires warrants for searches and arrests in most cases. There were adequate judicial protections against false charges, and detainees had the right of access to family or counsel, although family visits were restricted at maximum-security Pademba Prison (see Section 1.c.). On March 1, the Government lifted the state of emergency, under which many of these protections were suspended. Some detainees had not been informed of their legal status, and had no access to legal advice. There were provisions for bail and there was a functioning bail system. Many criminal suspects were held for months before their cases were examined or formal charges were filed. A number of prisoners in custody had not seen a judge since 1999 and 2000 (see Section 1.e.).

Following the demobilization of the CDF, there were no reports that CDF members arrested or detained persons during the year.

In July and August, four Liberian children were detained without charge at Pademba Road Prison and then released.

Following the lifting of the state of emergency, a large number of persons detained without charge were released or charged accordingly. At year's end, there were 18 persons who were detained for more than 2 years without charge; 17 were former SLA members and 1 was a former SLP officer.

On September 25, the Government expelled David Bropley, a Liberian ex-combatant, to Denmark for conducting "activities incompatible with his refugee status." Bropley had been in detention for 1 month prior to his expulsion.

The Government did not use forced exile.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary, and the Government generally respected this provision in practice; however, the judiciary continued to function only in part of the country. The judiciary began to reestablish operations in areas that were abandoned during the war, although there still were large parts of the country without judicial institutions. The judiciary demonstrated substantial independence in practice but at times was subject to corruption.

The judicial system consisted of the Supreme Court, appeals courts, and a high court whose justices were chosen by the President. Local courts administered traditional law with lay judges; appeals from these lower courts moved to the superior courts.

Although the Constitution and the law provide for a speedy trial, in practice the lack of judicial officers and facilities often produced long delays in the judicial process. Trials were usually fair; however, there was evidence that corruption influenced some cases. A majority of cases on the magistrate level were prosecuted by police officers, many of whom had little or no formal legal training. In 2000 the Armed Forces of the Republic of Sierra Leone (Amendment) Act reinstated the

right of members of the armed forces to appeal a sentence handed down by a court-martial to the Court of Appeal.

Traditional justice systems continued to supplement extensively the central government judiciary in cases involving family law, inheritance, and land tenure, especially in rural areas. In Kono District there were reports that former CDF and Movement of Concerned Kono Youth (MOCKY), held informal courts to settle disputes among area residents, typically those who were not satisfied with the results of the legal judicial system. MOCKY representatives denied these reports and said that they catalogued disputes and brought them for referral to the proper authorities.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution and law prohibit such practices, and government authorities generally respected these prohibitions in practice.

In March the government lifted the state of emergency, under which the Government permitted searches without warrants and established a nightly curfew.

In February former RUF commanders in Tongo Fields, Kenema District reported that youths from the Lower Bambara chiefdom tried to drive them out of the area. The ex-RUF commanders alleged that the youths were former CDF members under the influence of the Acting Paramount Chief. The youths allegedly harassed persons in Tongo Fields and imposed fines and taxes.

On July 6, approximately 100 persons destroyed dozens of homes in Kokwima, Kono District. Local chiefs and MOCKY allegedly carried out the attacks in an effort to rid the Kono area of non-Kono persons. MOCKY representatives claimed that individuals from Tankoro, Kono District destroyed the homes because police had failed to respond to reports that the dwellings were being used to traffick drugs. An individual who owned land on which many of the homes were built said that the only homes spared belonged to Konos.

Unlike in the previous year, there were no instances of rebel forces invading, looting, or destroying private property.

Unlike in the previous year, there were no reports that rebel forces kidnaped and forcibly conscripted children (see Section 5).

There was no action taken on unconfirmed reports that in March 2001 RUF fighters forcibly conscripted civilians in Makeni into the Poro Society, one of several secret societies in the country tied to indigenous beliefs and rituals, and forced them to join the RUF.

On July 21, five armed Liberians reportedly looted the villages of Kokobu and Gbandoma.

Unlike in the previous year, there were no reports that Guinean troops destroyed private property or burned homes.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; however, the Government at times limited these rights in practice. During the year, there were no bans on any newspapers, and no radio station was shut down for failure to pay fees. Unlike in the previous year, security forces did not harass journalists. The written press and radio generally reported on security matters, corruption, and political affairs without interference.

More than 50 newspapers were published in Freetown during the year, covering a wide spectrum of interests and editorial opinion. Most of the newspapers were independent of the Government, and several were associated with opposition political parties. The number of newspapers fluctuated weekly. Many contained sensational, undocumented stories and repeated items carried by other newspapers. Newspapers openly and routinely criticized the Government and its officials, as well as the rebel forces.

The Independent Media Commission (IMC) regulated independent media outlets. Although it was an independent body, some media observers alleged that the Government influenced it. In March the IMC ordered the editor of the African Champion newspaper to stop publication and cease editorial functions for 2 months in response to two articles printed on February 6 and 11 that accused President Kabbah's son of using a Consul's diplomatic status to escape import duties. The IMC said the editor, Mohammed Koroma, had to cease publication until an investigation was complete. Koroma ignored the demand on the grounds that the IMC did not have the legal right to demand his suspension. The IMC charged Mohamed Koroma to the High Court, but the case had not been heard by year's end.

In November Paul Kamara, editor of the For Di People newspaper, was sentenced to 6 months in prison for defaming a local judge. The court sent a letter to the President recommending the banning of the paper for 6 months, however, the ban was not implemented by year's end. International press rights groups called for the repeal of the criminal libel law under which Kamara was charged.

There was no action taken against police forces that detained and interrogated the editor of the Democrat newspaper in February 2001.

There was no further development on the rumors of "killing squads" that allegedly targeted a list of seven journalists in September 2001.

Due to low levels of literacy and the relatively high cost of newspapers and television, radio remained the most important medium of public information. Several government and private radio and television stations broadcast; both featured domestic news coverage and political commentary.

In February the IMC instituted a $2,000 (4 million Leones) annual license fee for single channel radio stations. Radio journalists and media monitors claimed that this fee was prohibitively expensive, and if enforced would limit severely the number of independent radio stations. The IMC threatened to close any radio station that did not pay the fee. At year's end, no stations had been closed.

The parastatal Sierratel communications company exercised a monopoly over Internet access in the country. The lack of competition and the poor condition of telephone lines often made Internet connectivity problematic.

The Government did not restrict academic freedom. All institutions of higher learning were open during most of the year; however, university infrastructure destroyed during the conflict was not yet restored fully by year's end.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly, and the Government generally respected this right in practice.

Several large demonstrations took place during the year, including demonstrations involving thousands of persons before the May elections. Although some demonstrations were marred by violence, most were relatively peaceful. At times UNAMSIL forces backed up government security forces in dealing with demonstrations.

The Government did not ban any demonstrations during the year.

On July 18, two persons were killed in demonstrations relating to the death of a well-known Fullah moneychanger in Freetown. A large crowd took the body of the moneychanger from the morgue and paraded it in the streets. UNAMSIL troops were deployed to key areas in central Freetown for security reasons. According to UNAMSIL, when the crowd became aggressive, UNAMSIL troops employed a combination of persuasion, crowd dispersal tactics, and firing of warning shots in the air. A consortium of domestic human rights NGOs investigated the incident and determined through alleged eyewitness accounts that UNAMSIL troops directly fired into the crowd, killing two civilians. A UNAMSIL investigation into the incident found no conclusive evidence as to how the individuals were killed.

RUF members who opened fire on demonstrators in 2000, killing at least 20 persons and injured 80 others, remained in detention at year's end (see Section 1.a.).

The Constitution provides for freedom of association, and the Government generally respected this right in practice. There were numerous civic, philanthropic, and social organizations, and the registration system was routine and nonpolitical. No known restrictions were applied to the formation or organization of the 16 opposition political parties and the more than 60 registered civic action NGOs. In 2001 21 political parties were registered; during the year, 16 political parties were registered. Some parties were integrated into other parties, such as the Grand Alliance Party. In 2001 the RUF alleged that the Government prevented the establishment of an RUF political party as called for in the Lome Accord. However, during the year the RUF registered as a political party, changed their name to the Revolutionary United Front Party (RUFP), and fielded presidential and parliamentary candidates.

c. Freedom of Religion

The Constitution provides for freedom of religion, and the Government generally respected this right in practice.

For a more detailed discussion see the 2002 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for these rights, and the Government generally respected them in practice; however, there were frequent reports that SLP officers manned roadblocks and stopped motorists to extort money from travelers (see Section 1.c.). Unlike in the previous year, there were no reports of RUF rebels or CDF members manning roadblocks.

Approximately 247,000 internally displaced persons (IDPs) remained at year's end. Some IDPs were housed in camps, but many lived in Freetown. Residents who feared that their homes would not be safe strongly resisted government attempts to close IDP camps. The large influx of IDPs and the lack of resources caused tension between local residents and IDPs; however, there were no reported incidents of violence. There were numerous reports that refugees and IDPs returned to find their homes occupied.

Approximately 135,000 refugees repatriated during the year. An estimated 70,000 persons remained in refugee camps in Guinea and Liberia; smaller numbers remained in Cote d'Ivoire, the Gambia, Ghana, and other countries and were likely to integrate locally in those countries.

Unlike in the previous year, there were no cross-border actions by the RUF in Guinea that contributed to the return of refugees from Guinea. Unlike in the previous year, there were no reports that the RUF raped, abducted, and killed refugees returning to the country from camps in Guinea.

The law does not provide for granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. However, in practice the

Government cooperated with the U.N. High Commissioner for Refugees (UNHCR) and other organizations on repatriation matters and continued to provide first asylum to an increasing number of Liberians who had fled the conflict in their home country. UNHCR reported that more than 50,000 Liberian refugees entered the country by year's end. Some camps such as Jendema Camp at times were not able to provide adequate food or shelter for the influx of refugees, which caused border areas to become unstable. However, at year's end, conditions in all camps were described as adequate.

The U.N. conducted an investigation into reports in 2001 of widespread sexual abuse of refugees in the Mano River Union, including Sierra Leone. The U.N. investigation found no evidence to support earlier claims of widespread abuse, but did confirm the report of the rape of a 14-year old returnee in Jui (see Section 1.c.). Other international aid workers reported that several cases of abuse and exploitation of refugees by aid workers took place throughout the year.

The Liberian border officially closed at times during the year due to the civil conflict in Liberia; however, authorities permitted refugees, returnees, and other persons to move between the two countries regularly. There were some unconfirmed reports of bribery or coercion at border crossing points, although UNHCR reported that the Government did not hinder or refoule those seeking asylum. At year's end, the border was open for all travel.

There were no reports of the forced return of persons to a country where they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change their Government

The Constitution provides for the right of citizens to change their Government; however, the May elections were marred by some irregularities.

In 2001 the Government extended the term of Parliament and the President by 6 months in response to the "state of war" in the country. In December 2001, Parliament voted to amend the Constitution in order to modify the electoral system. The amendments also extended President Kabbah's term of office until July. On March 29, Parliament was dissolved until the May elections.

During the year, the Government facilitated the RUF's re-registration as a political party, the RUFP. The Government did not allow Foday Sankoh to run as the RUFP Presidential candidate, citing a law that required candidates to be registered to vote and to file personally their candidacy with the National Electoral Commission (NEC). RUFP leadership said that Sankoh's registration was not possible because he was in government custody. The RUF alleged that the Government unfairly was trying to ward off a potential threat in the elections, because Sankoh had considerable name recognition and support in the country.

On January 24, the Government began voter registration for the May elections; however, there were reports that the Government's voter registration efforts were unbalanced, with more support going to areas that were dominated by the SLPP. There were widespread reports of underage voter registration.

On May 14, presidential and parliamentary elections were held. Eleven political parties were represented in the elections. President Kabbah of the SLPP was reelected with 70 percent of the popular vote. The RUFP fielded presidential and parliamentary candidates but performed poorly, winning only 1.7 percent of the vote. In Parliament the SLPP won 83 seats; only 2 other parties won seats. Only the SLPP was represented in the Cabinet after two cabinet members, who were earlier considered to be independent, joined the SLPP following the elections. Many international monitors declared the elections free and fair; however, there were credible reports of significant abuse of incumbency, manipulation of vote counting, and partisan action by the NEC. There also were reports of voter coercion by party bosses and traditional leaders. These abuses reportedly did not affect substantially the overall outcome of the election.

There were reports of significant problems on election day. Voter eligibility rules were changed during the course of election day. Early in the day, voters whose names did not appear on

registration lists but who held voter cards were allowed to vote. Later in the day, the NEC changed the rule, which led to confusion in some polling stations. One district, Pujehun, reported a 104 percent voter turnout. In the southern and eastern districts, results showed that opposition parties received zero votes in some areas, which was not credible given the observed participation in the election of opposition supporters in those districts.

Locally elected councils and a traditional chieftain system controlled local government. Local elections, which were to have taken place in 1999, again were postponed.

It was estimated that approximately 40 percent of women in the country voted and represented 13 percent of the candidates in the May elections. Sixteen women won seats in the 112-seat Parliament. There were three women in the Cabinet and one in the Supreme Court. A significant number of women were employed as civil servants.

No statistics were available concerning the distribution of votes among minorities. Only citizens could vote. The Constitution restricts the acquisition of citizenship at birth to persons of "patrilineal Negro-African descent." Since legal requirements for naturalization effectively denied citizenship to many long-term residents, a large number of persons of Lebanese origin, who were born and resided in the country, could not vote (see Section 5). There was a small percentage of the Lebanese population who had been naturalized and did vote, although the exact figure was unknown. There were no ethnic Lebanese members of Parliament.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated with few government restrictions, investigating and publishing their findings on human rights cases. Government officials generally were cooperative and responsive to their views. National Forum for Human Rights (NFHR) served as an umbrella organization for human rights groups in the country. More than 30 human rights NGOs were registered with NFHR, although only approximately 20 of these were said to be active. The majority of domestic human rights NGOs focused on human rights education, while only a few NGOs actively monitored and reported human rights abuses. The Campaign for Good Governance (CGG) oversaw widespread monitoring activities and has monitored human rights abuses in every province since 2000. CGG also undertook a conflict-mapping exercise that recorded more than 1,000 testimonies of victims and perpetrators of abuses during the war. The final report of this exercise was given to the Truth and Reconciliation Commission (TRC) and Special Court for use in carrying out these two institutions' respective mandates.

For the first time in years, human rights monitors were able to travel freely in previously rebel-held areas. Intensive reporting, data collection, and investigations started in these formerly inaccessible areas. Representatives of various international NGOs, foreign diplomats, the ICRC, and U.N. human rights officers were able to monitor trials and to visit prisons and custodial facilities during most of the year; however, the Government on occasion attempted to restrict such visits (see Section 1.c.).

UNAMSIL continued to operate regional human rights offices in the provincial capitals of Bo and Makeni in addition to the UNAMSIL Human Rights section in Freetown.

In July the U.N. Special Court for Sierra Leone, whose role is to try those who "bear the greatest responsibility for the commission of crimes against humanity, war crimes, and serious violations of international humanitarian law," began operations and was given 3 years to complete its mandate. By year's end, investigations had begun and construction had begun on court facilities in Freetown. It was not known when the first indictments would be made.

The TRC provided a forum for publicly airing the grievances of victims and the confessions of perpetrators from the civil war. The TRC began with three interim secretariats who initiated preparations for eventual public hearings. The TRC was delayed, partly by a lack of funding, but

was expected to begin public hearings in March 2003. In the interim, commissioners and staff began an education campaign throughout the country. The TRC suffered from management problems that delayed the Commission's start date and resulted in the dismissal of nearly the entire interim secretariat staff. OHCHR provided an interim administer in December to oversee a renewed hiring process. On December 4, 70 statement takers began collecting narratives throughout the country.

The U.N. and numerous NGOs, both domestic and international, continued to educate and sensitize the population about the TRC and the Special Court for Sierra Leone, and the Government supported these efforts.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution prohibits discrimination against women and provides for protection against discrimination on the basis of race and ethnicity; however, residents of non-African descent, particularly the Lebanese community, faced institutionalized political restrictions on the acquisition of citizenship.

Women

Domestic violence against women, especially wife beating, was common. The police were unlikely to intervene in domestic disputes except in cases involving severe injury or death. In rural areas, polygyny was common. Women suspected of marital infidelity often were subjected to physical abuse. Frequently women were beaten until they divulged the names of their partners. Because husbands could claim monetary indemnities from their wives' partners, the beatings often continued until the woman named several men even if there were no such relationships. There also were reports that women suspected of infidelity were required to undergo animistic rituals to prove their innocence.

Rape was recognized as a societal problem and was punishable by up to 14 years imprisonment. Cases of rape were underreported and indictments were rare, especially in rural areas. There were reports that former rebel forces continued to force women and girls to act as sex slaves. Medical or psychological services for rape victims were very limited. There were reports of the sexual abuse of refugees in refugee camps (see Section 2.d.).

FGM was practiced widely at all levels of society, although with varying frequency. The less severe form of excision was practiced. UNICEF and other groups estimated that 80 to 90 percent of women and girls had undergone the practice; however, local groups believed that this figure was overstated. FGM was practiced on girls as young as 5 years old. No law prohibits FGM. A number of NGOs worked to eradicate FGM and to inform the public about its harmful health effects. However, active resistance by women's secret societies, in which FGM commonly occurred as part of initiation rites, countered the well-publicized international efforts against FGM.

On July 31, SLP officers arrested 10 women in Freetown in connection with the death of a 14-year-old girl following an FGM rite. The girl reportedly was found lying on the ground, bleeding from her genital area. All 10 women were suspected to be members of the Bundu secret society.

Prostitution was widespread. Many women and girls, particularly those displaced from their homes and with few resources, resorted to prostitution as a means to support themselves and their children.

The Constitution provides for equal rights for women; however, in practice women faced both legal and societal discrimination.

In particular their rights and status under traditional law varied significantly depending upon the ethnic group to which they belonged. The northern Temne and Limba tribes gave greater rights to women to inherit property than did the southern Mende tribe, which gave preference to male heirs and unmarried daughters. In the Temne tribe, women could not become paramount chiefs;

however, in the Mende tribe, there were several female paramount chiefs. Women did not have equal access to education, economic opportunities, health facilities, or social freedoms. In rural areas, women performed much of the subsistence farming and had little opportunity for formal education.

Women were active in civic and philanthropic organizations. Domestic NGOs such as 50/50 and Women's Forum raised awareness of gender equality and women's issues and encouraged women to enter politics as candidates for Parliament.

Children

The Government was committed to improving children's education and welfare; however, it lacked the means to provide them with basic education and health services. The Ministry of Social Welfare, Gender, and Children's Affairs had primary responsibility for children's issues.

The law requires school attendance through primary school. Schools, clinics, and hospitals throughout the country were looted and destroyed during the 11-year insurgency; most were not rebuilt by year's end. A large number of children received little or no formal education. Schools were financed largely by formal and informal fees, but many families could not afford to pay them. The average educational level for girls was markedly below that of boys, and only 6 percent of women were literate. At the university level, male students predominated.

FGM was performed commonly on girls (see Section 5, Women).

More than 6,000 child soldiers served alongside adults on both sides during the civil conflict, but in greater numbers on the rebel side. Some observers estimated that there were almost twice that many child soldiers. In 2001 the recruitment of children for military service by the CDF and the kidnaping and forced conscription of children into rebel forces ceased.

The National Commission for Disarmament, Demobilization, and Reintegration listed 6,845 demobilized child combatants. Girls represented 8 percent of demobilized child soldiers, and 30 percent of reunified noncombatant separated children. Because U.N. and human rights monitors estimated that girls represented 50 percent of those abducted during the war and there were reports that the rebels released disproportionate numbers of boys, these groups fear that many girls continued to be held as sex slaves. UNICEF reported in August that almost 7,000 children, including nearly 5,000 ex-combatants and nearly 2,000 noncombatant separated children, had been reunified with their families. More than 3,500 children of both groups were engaged in formal and informal education programs. Others were in special transitional centers, which were designed to help provide for their unique mental and emotional needs prior to reunification with their families. There continued to be reports that some families and communities rejected the returnees because of their perceived involvement in rebel atrocities. Child protection agencies reported that hundreds of boys and girls did not participate in the formal demobilization process. Locating the families of released child combatants often was difficult, and some did not want to assume responsibility for their children, some of whom were mentally and emotionally incapable of rejoining their families.

Persons with Disabilities

There was no outright discrimination against persons with disabilities in housing or education; however, given the high rate of general unemployment, work opportunities for persons with disabilities were few. Public facility access and discrimination against persons with disabilities were not considered public policy priorities. Although a few private agencies and organizations attempted to train persons with disabilities in useful work, there was no government policy or program directed particularly at persons with disabilities. No law mandates accessibility to buildings or provides assistance to persons with disabilities. In May the Government made some effort to facilitate access to voting for persons with disabilities, particularly for the blind.

Some of the numerous individuals maimed in the fighting, or had their limbs amputated by rebel forces, received special assistance from various local and international humanitarian organizations.

Such programs involved reconstructive surgery, prostheses, and vocational training to help them acquire new work skills; however, amputees complained that they did not receive sufficient assistance compared to ex-combatants, who received assistance through the demobilization process. Although the Lome Accord also called for the creation of a special fund to implement a program for rehabilitation of war victims, the fund had not yet been established by year's end. Attention to amputees increased the access of other persons with disabilities to health care and treatment.

National/Racial/Ethnic Minorities

The ethnically diverse population consisted of at least 13 ethnic groups. These groups all spoke distinct primary languages and were concentrated outside urban areas; however, all ethnic groups used Krio as a second language. Little ethnic segregation was apparent in urban areas. Interethnic marriage was common. The two largest ethnic groups were the Temne in the north and the Mende in the south. Each of these groups was estimated to make up approximately 30 percent of the population. There were reports of interethnic tension (see Section 1.f.).

Ethnic loyalty remained an important factor in the government, the armed forces, and business. Complaints of ethnic discrimination in government appointments, contracts, military commissions, and promotions were common.

Residents of non-African descent faced institutionalized political restrictions (see Section 3). Legal requirements for naturalization, such as continuous residence in the country for 15 years or the past 12 months and 15 of the previous 20 years, effectively denied citizenship to many long-term residents, notably members of the Lebanese community.

Section 6 Worker Rights

a. The Right of Association

The Constitution provides for the right of association, and in practice, workers had the right to join independent trade unions of their choice. Approximately 60 percent of the workers in urban areas, including government workers, were unionized, but attempts to organize agricultural workers and mineworkers have met with little success. All labor unions generally joined the Sierra Leone Labor Congress (SLLC), but membership was voluntary. There were no reliable statistics on union membership, but membership numbers declined as a percentage of all workers because of the virtual collapse of the small manufacturing sector. Police and members of the armed services were prohibited from joining unions.

The Trade Union Act provides that any five persons may form a trade union by applying to the registrar of trade unions, who has statutory powers under the act to approve the creation of trade unions. The registrar could reject applications for several reasons, including an insufficient number of members, proposed representation in an industry already served by an existing union, or incomplete documentation. If the registrar rejected an application, the decision could be appealed in the ordinary courts, but applicants seldom took such action.

The law does not prohibit antiunion discrimination against workers or employer interference in the establishment of unions; however, there were no reports of such cases during the year. An employee fired for union activities could file a complaint with a labor tribunal and seek reinstatement. Complaints of discrimination against trade unions were made to a tribunal.

Unions were free to form federations and to affiliate internationally. The SLLC was a member of the International Confederation of Free Trade Unions (ICFTU).

b. The Right to Organize and Bargain Collectively

The Regulation of Wages and Industrial Relations Act provides the legal framework for collective

bargaining. Collective bargaining must take place in trade group negotiating councils, each of which had an equal number of employer and worker representatives. Most enterprises were covered by collective bargaining agreements on wages and working conditions. The SLLC provided assistance to unions in preparations for negotiations; in the case of a deadlock, the government could intervene. The Industrial Court for Settlement of Industrial Disputes began hearing cases in 2000; although most cases involving industrial issues continued to go through the normal court system, the Industrial Court heard more than 50 cases during the year.

Workers had the right to strike, although the Government could require 21 days' notice. There were several significant strikes in the public sector during the year. Most notably teachers and doctors went on strike over wages and unpaid salaries in the form of work stoppages and sick-outs. Teachers, doctors, and nurses went on strike during the year. Teachers struck in January, and nurses and doctors struck in February and March. According to the president of Sierra Leone Nurses' association, the Government eventually accepted 80 percent of the nurses' demands. Workers from Sierratel, a telecommunications parastatal, went on strike over refunds of pension benefits.

No law prohibits retaliation against strikers, even for a lawful strike; however, the Government did not take adverse action against the employees and paid some of them back wages.

There were no export processing zones (EPZs).

c. Prohibition of Forced or Bonded Labor

The Constitution prohibits forced and bonded labor, including by children; however, forced labor remained a problem. Under the Chiefdom's Council Act, individual chiefs could impose forced labor as punishment, and have done so in the past. They also could require members of their villages to contribute to the improvement of common areas. This practice occurred only in rural areas. There was no penalty for noncompliance. There were reports of some bonded labor, possibly including labor by children, in rural areas.

Some women and girls, although in significantly less numbers than before, allegedly remained as sex slaves with former RUF rebels (see Section 5). There were reports that former RUF commanders continued to force children to mine diamonds (see Section 6.f.).

Liberian forces abducted persons for forced labor (see Section 1.b.).

d. Status of Child Labor Practices and Minimum Age for Employment

The official minimum age for employment was 18 years; however, children between the ages of 12 and 18 years could work in certain non-hazardous occupations, provided that they had parental consent. Due to a severe lack of resources, the Government was unable to implement these laws.

Children routinely assisted in family businesses and worked as petty vendors. Adults employed a large number of street kids to sell, steal, and beg. In rural areas, children worked seasonally on family subsistence farms. Hundreds of children, including those 10 years old and younger, mined in alluvial diamond fields. A majority of these children worked for relatives; however, some reportedly worked for former RUF commanders.

Because the adult unemployment rate remained high, few children were involved in the industrial sector. Foreign employers hired children to work as domestic laborers overseas at extremely low wages and in poor conditions. The Department of Foreign Affairs and International Cooperation was responsible for reviewing overseas work applications to see that no one under the age of 14 was employed for this purpose; however, the reviews were not effective.

The Constitution prohibits forced and bonded labor by children; however, such practices continued to exist (see Section 6.c.).

e. Acceptable Conditions of Work

The minimum wage was approximately $10.50 (21,000 Leones) per month; it had not been adjusted since 1997. The minimum wage was not sufficient to provide a decent standard of living for a worker and family. Most workers supported an extended family, often including relatives who were displaced by the insurgency in the countryside. It was common to pool incomes and to supplement wages with subsistence farming and child labor (see Section 6.d.).

The Government's suggested workweek was 38 hours, but most workweeks exceeded that figure.

Although the Government set health and safety standards, it lacked the funding to enforce them properly. Trade unions provided the only protection for workers who filed complaints about working conditions. Initially a union could make a formal complaint about a hazardous working condition; if this complaint were rejected, the union could issue a 21-day strike notice. If workers were to remove themselves from dangerous work situations without making a formal complaint, they risked being fired.

The law protects both foreign and domestic workers; however, there were fewer protections for illegal foreign workers.

f. Trafficking in Persons

The law does not prohibit trafficking in persons, and there were reports that persons were trafficked from and within the country. Child prostitution was a problem (see Section 5). With the end of the war and the demobilization of child soldiers, trafficking in persons lessened significantly. The Government acknowledged unconfirmed reports of limited trafficking withing and from the country; however, it lacked resources to address the problem adequately. There were no figures available on the extent of the trafficking problem.

During the year, the Government compelled the RUF to disarm, demobilize, and release its child soldiers; however, there were concerns that a significant number of children remained with their captors. It was likely that small groups of previously captured women and girls continued to be forced to act as sex slaves (see Section 5).

Unlike in the previous year, there were no reports that rebels abducted persons to work as servants or laborers in the diamond fields; however, there were reports that former RUF commanders continued to use children to mine diamonds. The Government had not yet asserted complete control over the diamond fields by year's end.

In July Liberian soldiers abducted men, women, and children and used them as porters and other unknown purposes (see Section 1.b.).

Aloysious Allie Conteh - 80146
York County prison
3400 Concord Rd
York pennsylvania
17402-9007

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

CERTIFIED MAIL™

7003 0500 0004 0848 8708

U.S. POSTAGE
PITNEY BOWES
090 PB35535
084 $05.57⁰ JAN 27 20
385 MAILED FROM ZIP CODE 174

FILED
HARRISBURG
JAN 29 2004
MARY E. D'ANDREA, CLERK
Per: DEPUTY CLERK

THE CLERK OF COURT
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
228 Walnut Street
HARRISBURG, PA 17108